# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00100-CV

**Rosita Johnson, Appellant**

**v.**

**Raymond Nicholas Kimbrough, Appellee**

### FROM THE 20TH DISTRICT COURT OF MILAM COUNTY
### NO. CV40692, THE HONORABLE JOHN YOUNGBLOOD, JUDGE PRESIDING

## O P I N I O N

Rosita Johnson, the maternal great-grandmother of the child the subject of this suit, appeals from the trial court's order modifying the parent–child relationship. Rosita sought to modify the prior order appointing her and the child's mother, Sara Johnson, as joint managing conservators and the child's father as possessory conservator.[1] Sara passed away in March 2020, spurring Rosita's modification suit. The child's father, Raymond Nicholas Kimbrough, filed a counterpetition to modify. Rosita contends that the trial court abused its discretion in applying the fit-parent presumption to appoint Kimbrough as the child's sole managing conservator. We agree. For the following reasons, we reverse the order and remand this case for further proceedings.

---

[1] Because Rosita Johnson and Sara Johnson share the same last name, for clarity we refer to them by their first names.

## PROCEDURAL BACKGROUND

Kimbrough and Sara are the parents of G.K., who was five years old when this modification suit was tried. G.K.'s parents were divorced per a 2016 divorce decree in which Sara was appointed sole managing conservator and Kimbrough possessory conservator. In an April 2018 order, Sara and Kimbrough were appointed temporary joint managing conservators of G.K., and Rosita was granted exclusive sole possession of the child. Under that order, visitation with G.K. for either Sara or Kimbrough was to be at Rosita's discretion, and Sara's visitation was to be supervised by Rosita. Less than a week later, Sara and Rosita filed a petition for writ of habeas corpus alleging that Kimbrough had refused to surrender G.K. and was illegally restraining her in contravention of the order. Shortly thereafter, the court issued a writ of attachment and a writ of habeas corpus, commanding Kimbrough to produce G.K. to the court.

In a July 2019 order, Sara and Rosita were appointed joint managing conservators, Rosita was granted the exclusive right to designate G.K.'s primary residence, and Kimbrough was appointed possessory conservator.[2] In April 2020, shortly after Sara's death, Rosita filed a petition to modify the parent–child relationship, seeking to be appointed sole managing conservator and alleging that Kimbrough "has engaged in a history or pattern of child neglect." In June 2020, Kimbrough, who lives in Georgia, filed a counterpetition to modify seeking to be appointed sole managing conservator and attaching an affidavit purportedly "setting forth the statutory allegations and supporting facts" to allow modification of the party having the exclusive right to designate the primary residence of the child within one year after the date of the rendition of the order sought to be modified. *See* Tex. Fam. Code § 156.102.

---

[2] The order recited that Kimbrough had made a general appearance and was duly notified of trial but failed to appear and defaulted.

A final hearing on the parties' competing petitions occurred October 29, 2021. The court initially swore in seven witnesses, some of whom had flown in from out of town and two of whom were G.K.'s teachers. Then, in answer to the trial court's query about what "the issue" was, Rosita's counsel explained that Rosita was seeking sole managing conservatorship of G.K. while Kimbrough was seeking that the child live with him in Georgia. The trial court inquired of Rosita, "And what issues are you going to be alleging that doesn't [sic] make it appropriate for the child to live with [her] father[?]" Rosita's counsel summarized the evidence that would be forthcoming—including that G.K. had lived with Rosita nearly her entire life and is thriving there—and Kimbrough's counsel explained that pursuant to either Chapter 151 or 153 of the Family Code, the court "is compelled" to grant a parent custody "in the absence of any compelling evidence" against that parent.

The court then asked Rosita whether she wanted to call her first witness, and Rosita attempted to call Kim Pizana, one of G.K.'s teachers. However, before Pizana began to testify, the trial court stated that it was going to try to "pare this down a little bit" by taking it "as basically a given that the child is doing well" under Rosita's custody. The trial court further explained, "[T]his case is going to turn on whether there is some pretty significant reason to place the child with a relative as opposed to a parent, and that burden is going to be pretty high." The court continued,

> So you can go on and on about how great the [great-]grandmother is and the appraisement and all that, but again, I take that as a given, and itself really not at issue as far as I'm concerned, so if you have got fifteen witnesses lined up to say how great she is, I'm not going to need to hear a lot of that.

Rosita's counsel asked whether the court would hear evidence such as "[h]ow the child is doing in school and that kind of thing," to which the court replied, "That's part in partial [sic] of her

3

current location but I will hear some of it." Rosita's counsel then stated that if the court "would just like to hear from the parties," she was "open to that" but that she did have some testimony about Kimbrough in 2017 having custody of G.K. for "a couple of months and basically [leaving] her back with her mother and that's how she ended up back with" Rosita. The court responded, "That's the kind of stuff I do need." Rosita's counsel then offered to "excuse the teachers" if the court wanted to hear testimony solely from the parties, which the court represented was "the way [it] would prefer it." Rosita's counsel then proceeded to call Kimbrough to testify and thereafter Rosita.

After the close of evidence, the trial court made the following remarks and ruled in favor of Kimbrough:

> [To Rosita:] Ma'am, I can't say enough good things about you. . . . But at the end of the day, this child has a parent and children belong with their parents or suitable, of course, and, yes, this gentleman may have not did what we would like to see preferably with regard to raising a child to date, but he is still her parent and I don't think he has disqualified himself as being a parent to the child. So I am ordering that the—he be given custody of the child.

The trial court further stated that the effective date of Kimbrough's custody would be in early January "because of the school year" but that the court was also "in favor of giving [Rosita] more time with the child and transitioning into this situation" and that it was going to leave it up to the parties to "come up with a visitation schedule or agreement between" them regarding Rosita's possession periods.

On December 20, 2021, before the trial court signed its final order on review before us, Rosita filed a motion to stay the court's ruling pending its entry of an order and a motion to reconsider asking the court to "reopen the evidence," attaching affidavits from "some of the witnesses who were unable to testify at trial" due to the court's decision to not hear them.

4

In her motion to reconsider, Rosita argued that the "fit parent presumption" does not apply in this case, supporting her argument with caselaw, and that several factors are relevant in determining G.K.'s best interest, including G.K.'s "present circumstances" of living with Rosita for most of her life and the facts that Kimbrough had not (a) paid court-ordered child support, (b) sought to gain custody of G.K. from 2018 to 2020, (c) exercised his possession rights except for a few times since 2018, or (d) completed his "stepped-up" visitation from the 2019 order.[3]

The trial court conducted a hearing on January 5, 2022, on Rosita's motion for reconsideration, at which Rosita argued that the trial court erred in determining that the fit-parent presumption applied, and she explained that in the merits hearing the trial court "didn't want to hear" the additional testimony that Rosita was prepared to offer about "the stability of the child here and the community" that Rosita had established for G.K. due to the trial court's improper determination about the presumption. Rosita asked that the trial court stay its ruling until the additional evidence—from members of Rosita's church, the community, and G.K.'s teachers— could be heard. Rosita asked to make an offer of proof as to the witnesses who had not "been given a chance to testify." In response, the trial court stated,

> Let me just say this . . . these additional witnesses that were on the horizon, both at the final hearing and on this motion to reopen, I can only assume what they are going to say. They are going to say that this lady was doing a fantastic job with the child, that the child was doing very well here in current conditions, and, you know, I take . . . that as a given. There is no dispute the child is doing well. At the end of the day, the issue is who is entitled to custody of this child given the circumstances faced with the deceased mother and otherwise unchallenged [sic] as to fitness.

---

[3] The order provided that Kimbrough was to have three two-hour visitations with G.K., supervised by Rosita; then three four-hour supervised visitations; then a series of eight total unsupervised visitations (two for two hours, two for four hours, and two for eight hours). Thereafter, he would be entitled to standard possession, but he was not allowed to remove G.K. from Texas. He was also ordered to pay monthly child support to Rosita.

I mean, I use this analogy quite often in CPS cases, and I say, you know, I have a kid, teenager now, and I used to use the example of Bill Gates drives through town and sees my kid walking down the sidewalk, perhaps I should change that analogy now to Jeff Bezos or Elon Musk, but frame it how you will, but they drive through town and say, hey, that's a good looking kid walking down the sidewalk, maybe I should just adopt that kid and make him privy to all I have to offer a child. Well, can it be said that my child wouldn't probably be better off with Elon Musk or Jeff Bezos as a parent? Look what opportunities would open up for him.

But that's not how it works. That's not appropriate. That's just not how it works. A parent is a parent. This gentleman, short of a showing of inappropriateness, is this child's parent. And I appreciate what the [great-]grandmother has been through and has done for this child, and again, I'm sure a legion of witnesses could be organized to come in and say this child is doing great here and the [great-]grandmother is a wonderful person, and I'm sure that she is, and no one is disputing that whatsoever, and it could be, just like my child might be better off living in Seattle, this child might be better off living here in Cameron. But this gentleman is the child's parent and we just don't throw that off and throw it out willy-nilly. That's not appropriate.

So with all that said and all this bickering back and forth, I'm just not moved to change my original ruling and so I am going to deny the motion this morning.

Thereafter, on January 5, 2022, the trial court signed its Order in Suit to Modify the Parent–Child Relationship, finding that Kimbrough "had met his burden" to establish that a material and substantial change in G.K.'s circumstances had occurred since rendition of the last court order rendered in this case and that it was in G.K.'s best interest that Kimbrough be appointed sole managing conservator and Rosita be appointed possessory conservator. Thereafter Rosita filed a request for findings of fact and conclusions of law, which the trial court issued on March 1, 2022. Among the findings are (a) that it is in G.K.'s best interest that Kimbrough be appointed sole managing conservator and (b) that the possession periods should vary from the standard possession order because Rosita "is not a parent of the child, and the conservators live a considerable distance apart."

6

On January 31, 2022, Rosita filed a motion for new trial, arguing that the trial court abused its discretion in "rejecting the admission of material evidence at trial" and that the "great weight and preponderance of the evidence supports only a finding that it was in [G.K.]'s best interest for the Court to appoint Rosita" as her primary conservator. At a February 10, 2022 hearing on her motion for new trial, Rosita again argued to the trial court that the fit-parent presumption does not apply and that she and Kimbrough should have "started off on equal footing" regarding a conservatorship determination. She stated that there was "material evidence that was not presented at trial in the form of witnesses here from this county that would testify as to the child's well-being and the way she was excelling here under the guidance and care of" Rosita. Again, the trial court "concede[d] . . . that everything in that regard was certainly true." The trial court continued,

> I'm sure [Rosita] is a fine upstanding lady and the child was doing well, obviously. There was no dispute there. And I'm sure your witnesses would have confirmed that. And I took all of that into account and, again, conceded that point as being true. But at the end of the day, we had a parent versus a grandparent or great-grandparent, yes, ma'am.
>
> And I know you have got your legal arguments with regard to that but I heard no, and I took a good look at dad, believe me, with his situation, and didn't see good cause to strip a child from its parent and that's what I ruled on. And I'm sure your client would be disappointed to hear but I have not changed my position in that regard.

Rosita's counsel explained that she "respectfully disagreed" but "wanted to go through the legal process." The trial court explained that it understood but was going to nonetheless deny Rosita's motion for new trial. This appeal ensued.

**EVIDENCE**

***Kimbrough's testimony***

Kimbrough testified that the only time G.K. has lived with him was for a nine-month period in Texas beginning sometime in 2017, the last year he was in the military. He added that except for that period, G.K. has lived with Rosita "basically most of her life." Without elaborating, he stated that CPS placed G.K. with him sometime in 2017 and that she stayed with him until February or March 2018. He explained that over the 2017 Christmas holidays he was "exiting the military"—"a giant transition period" for him—and that he allowed G.K. to stay with Rosita and Sara for a "couple extra weeks." He explained that after that period, G.K. went back to Sara and Rosita's custody because he defaulted on a court hearing he did not know about.

In June 2018 he moved to Georgia, and he saw G.K. only one time that year. He saw G.K. two times in 2019. He testified that, "until recently," he had been "unaware of the full order" rendered in 2019 that gave him stepped-up visitation with G.K. in Texas. Even though he had recently learned about the 2019 order requiring him to pay child support, he has not paid any. He lives in Atlanta with his girlfriend of two-and-a-half years, and almost all of his family, including his father and sister, live in Atlanta. He has "multiple family members" and support in Atlanta to help him care for G.K. if he is unable due to sickness or other reasons.

Kimbrough began participating in the stepped-up visitation in March 2021, about two years after rendition of the 2019 order allowing it, and he has visited with G.K. for some of the specified visitations. However, he had not finished the prescribed visitations and had not had any for the last four months preceding the hearing due to "scheduling, COVID, [and being] out-of-state." For several of his visitations with G.K., Rosita had rearranged her schedule to

8

accommodate Kimbrough. However, over the previous years, he had attempted on "countless occasions" to visit with G.K., including offering to fly Rosita, Sara, and G.K. to Georgia, but he was often met with a "lack of responding or the lack of working out a schedule." Rosita had been "amazing" with respect to scheduling and accommodating phone calls between him and G.K.

Kimbrough testified that he works at an insurance company in customer support, for which position he had to pass a background check, is subject to drug and alcohol screening, and is a trustee of sensitive client information. Although his current work schedule is 4:00 p.m. to midnight, the hours could change to be more child-friendly because the company is "very willing and cooperative" when it comes to accommodating for G.K. Kimbrough described the area of Atlanta in which he lives, stated that the school where G.K. would attend is fifteen miles away (and that he could drive her to school or that she could take the bus), and explained that he is able to provide anything G.K. might need. His girlfriend, who does not have children, is a public defender in Atlanta. If he were to gain custody of G.K., one of his "first moves" would be to get "emotional counseling" for her.

Kimbrough testified that he has never received any correspondence from the Texas Attorney General's office about child support except that the office sent him a check for $3,500 after Sarah died. G.K. has met most of his relatives in Atlanta, and if he gains custody of her, he plans to ensure that Rosita is able to visit with G.K. as much as possible. Rosita did not inform him about the 2019 order's step-up possession provisions; he had only recently learned about them from the court. Nonetheless, for three years he did not seek custody of G.K. because "getting out of the military can be emotional" and because "lawyers are expensive."

Kimbrough admitted that in April 2016 he was placed on "misdemeanor deferred adjudication" for an "ABI" (assault bodily injury) charge wherein the victim was Sara. That case

9

has been fully resolved and is the only criminal charge ever filed against him. The police have never been called to his home in Atlanta for a "domestic dispute" between him and his girlfriend. He cooperated fully with the investigation in the prior "CPS case that came out of this county" involving G.K.[4] He does not have any other children and does not plan to move from his two-bedroom home any time soon. Although the home does not have a backyard, it is in a walkable neighborhood near parks and is fenced off from the street.

*Rosita's testimony*

Rosita testified that G.K. is in kindergarten and "loves it." G.K. loves being outside, dancing, and gymnastics. She likes reading, riding her bike, and playing like "normal kids." Rosita explained that she has "another granddaughter[, M.R.J.,] that lives with" her and that G.K. and M.R.J., who is fourteen, "are like sisters." G.K. refers to M.R.J. as her "big sister," and the girls are "very close." G.K. has a brother, N.B., who is seven, whom she sees often, as N.B. "gets out of school earlier" than G.K. does and spends time in the afternoon with her. Additionally, N.B. sometimes stays weekends at Rosita's house. G.K. and her brother "get along really well," and G.K. is "really crazy about him."

G.K. first lived with Rosita from the time she was born until she was two months old (along with Sara), and then G.K. lived with Rosita again from the age of four months to nine months. G.K. then lived with Kimbrough from the age of nine months to eighteen months but thereafter returned to live with Rosita and has remained with her until present. Rosita has not received any child support from Kimbrough. Rosita, Rosita's husband, and Sara (while she was alive) have been "the ones that ha[ve] taken care of [G.K.] and give[n] her everything."

---

[4] Other than a few passing references, the record does not reveal any of the circumstances of the "CPS case."

10

Rosita testified that she has never denied Kimbrough a visit with G.K. but did not permit him to take her out of Texas because it was prohibited by court order. Rosita has maintained "fairly good records with regard to G.K." to ensure that she would "have records of everything that happened" in case Kimbrough "ever decided he did want [G.K.] back." Rosita explained that Kimbrough "was granted primary custody of [G.K.] in 2017," during a period when Sara was not living with her. During that time Sara "was on a program where she would get visitation" with G.K. After Christmas of that year, Kimbrough left G.K. with Rosita and Sara for about three months.

Rosita corroborated Kimbrough's testimony that after she and Sara "took custody" of G.K. in 2018, Kimbrough saw G.K. one time that year. He did not make any attempts to see her more. Kimbrough did not appear at the court hearing in 2019, which resulted in the current order at issue, but Rosita and G.K. met him the next day at a McDonald's for a visit. Kimbrough did not ask Rosita what had happened at the hearing the day before. Besides that McDonald's visit, G.K. saw Kimbrough one other time in 2019, during a visit to Austin that Rosita arranged with Kimbrough's sister. After Sara died in March 2020, Kimbrough asked Rosita if he could take G.K. to Georgia, but Rosita did not allow it because a court order prohibited G.K.'s being removed from the state. Kimbrough did not come to Texas to see G.K. after Sara died, but he did see her one time in 2020, on G.K.'s birthday.

Rosita filed her motion to modify after Sara died so that G.K. would be able to stay with her and her husband "because it was the home that she knew" and Rosita "didn't want to upset [G.K.] anymore after losing her mother." Rosita explained that Kimbrough has frequent phone calls with G.K., which she "makes happen," but that G.K. "doesn't like talking on the phone" and Rosita believes the child "feels forced to talk to her dad." Although the 2019 order

11

had provided Kimbrough with "stepped up visitation," he did not begin any of those visits until March 2021. He had a total of four visitations with G.K. between March and July 2021, all of which were supervised by Rosita. On the third visit, which occurred at the Austin Zoo, Kimbrough "was tired and trying to work so he didn't pay a lot of attention to [G.K.] that day." Although he talked to G.K. some of the time, Rosita was "the one that was basically taking care of [G.K.] the whole time." Kimbrough did not request any more visitations after the fourth supervised visit in July. Rosita explained that the phone calls were still occurring and that she tries her best to accommodate Kimbrough's schedule in making the phone calls happen. She also sends him pictures and updates about G.K.

Besides her brother and Rosita's fourteen-year-old granddaughter, G.K. sees other local extended family—cousins, aunts, great-aunts—"nearly every day." G.K. has attended church with Rosita since she was a baby, and she has "good relationships" with the people there, who "all love her and know her because she has grown up there" and they are "like family." Rosita is not opposed to Kimbrough's having visitation, but she feels that if Kimbrough were to take G.K. to Georgia with him, it would be a "mistake for [her] mental state and people she has known all her life, the only family she was very close to." Even though Kimbrough is G.K.'s father, he has "never really ever been around." G.K. calls Rosita "Momma," even though she knows the difference between Rosita and Sara, whom she called "Mommy." Rosita did not have a plan in place if something were to happen to her, although she is healthy and her husband is still alive.

## STANDARD OF REVIEW

The relevant questions in a modification case are whether the circumstances of a party affected by the original order have materially and substantially changed and whether modification would be in the child's best interest.[5] *See* Tex. Fam. Code § 156.101(a). The party seeking modification must establish these elements by a preponderance of the evidence. *Spence v. Davis*, No. 03-22-00179-CV, 2023 WL 427063, at *1 (Tex. App.—Austin Jan. 27, 2023, no pet.) (mem. op.). We review a trial court's decision to modify conservatorship for an abuse of discretion. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). The test for abuse of discretion is whether the trial court acted in an arbitrary and unreasonable manner or whether it acted without reference to any guiding principles. *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.). Generally, a trial court does not abuse its discretion if the record contains some evidence of a substantive and probative character to support its decision on modification of conservatorship. *See Zeifman*, 212 S.W.3d at 589. However, a trial court has no discretion to incorrectly analyze or apply the law, and its clear failure to analyze or apply the law correctly is an abuse of discretion. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

## DISCUSSION

In one issue, Rosita contends that the trial court abused its discretion by applying the "fit parent presumption" in this modification proceeding. We first determine whether the presumption applies under these circumstances and thus whether it would have been legal error for the trial court to apply it. If the presumption does not apply, we then consider whether the

---

[5] Neither party challenges the trial court's finding that the circumstances materially and substantially changed, and the record supports that they have, in that Sara is now deceased. Thus, we do not address this question. *See* Tex. R. App. P. 47.1.

record demonstrates that the trial court applied the presumption and thus abused its discretion and whether the improper application of the presumption was harmful. *See* Tex. R. App. P. 44.1(a) (providing that no judgment may be reversed for error of law unless error was harmful).

Rosita acknowledges that Texas has a constitutional and statutory presumption when determining conservatorship *in the first instance*: one or both of a child's parents "shall" be appointed managing conservator *unless* the appointment would "significantly impair the child's physical health or emotional development." *See* Tex. Fam. Code § 153.131(a); *see also In re C.J.C.*, 603 S.W.3d 804, 807 (Tex. 2020) (referring to such presumption as "the fit parent presumption" because "fit parent" is presumed to act in child's best interest); *see also Troxel v. Granville*, 530 U.S. 57, 68 (2000) ("[T]here is a [constitutional] presumption that fit parents act in the best interests of their children."). In other words, the Section 153.131 presumption equates the appointment of one or both parents as managing conservator with such appointment's being in a child's best interest, absent a finding of significant impairment. *See* Tex. Fam. Code § 153.131(a). The supreme court has determined that the presumption also applies in modification proceedings when the fit parent seeking modification was appointed managing conservator in the order sought to be modified. *See C.J.C.*, 603 S.W.3d at 818–19. However, as Rosita's argument continues, such presumption does not apply in a modification proceeding with respect to a parent who was not appointed managing conservator in the order at issue. *See id.* at 819 (holding that when order sought to be modified appointed one or both fit parents as managing conservators, "that parent or parents retain the presumption that protects their fundamental right to determine their child's best interest"); *compare* Tex. Fam. Code § 153.131(a) ("[A] parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators" unless the court finds that appointment of one or

14

both parents "would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development."), *with id.* § 156.101 (outlining requirements for court's modification of order providing for appointment of conservator).

We agree with Rosita that the fit-parent presumption does not apply to Chapter 156 modification proceedings where the parent seeking modification was not appointed managing conservator under the existing order sought to be modified. *See In re R.A.*, No. 09-20-00275-CV, 2022 WL 7180524, at *7 (Tex. App.—Beaumont Oct. 13, 2022, no pet.) (mem. op) (holding that parent who was not appointed as child's managing conservator in order sought to be modified could not avail himself of fit-parent presumption in modification proceeding); *In re B.B.*, 632 S.W.3d 136, 140 (Tex. App.—El Paso 2021, no pet.) (same). The supreme court has identified the policy reasons for the legislature's omission of the parental presumption in modification proceedings: "Chapter 156 modification suits raise additional policy concerns such as stability for the child and the need to prevent constant litigation in child custody cases." *C.J.C.*, 603 S.W.3d at 818 (quoting *In re V.L.K.*, 24 S.W.3d 338, 340 (Tex. 2000)). Further, the supreme court explained, "the modification statute reflects the understanding that '[t]he first judgment at the time it was entered was res adjudicata of the question of the child's best interest and of the custody.'" *Id.* (quoting *Taylor v. Meek*, 276 S.W.2d 787, 790 (Tex. 1955)).

Kimbrough was not appointed sole or joint managing conservator in the original divorce decree or in the most recent custody order of July 19, 2019, which is the order at issue in this modification proceeding. Not appointing him as managing conservator either time reflects two separate trial-court determinations that the appointment at each time was not in G.K.'s best interest. *See* Tex. Fam. Code § 153.131(b) ("It is a rebuttable presumption that the appointment

15

of the parents of a child as joint managing conservators is in the best interest of the child."); *see also id.* § 156.101 (providing grounds for modification of order establishing conservatorship or possession and access). We thus agree with Rosita that the trial court was not permitted to rely on the fit-parent presumption in this case. *See R.A.*, 2022 WL 7180524, at *7; *B.B.*, 632 S.W.3d at 140.

The fit-parent presumption places a burden on the party seeking to overcome it to prove by a preponderance of the evidence that the parent is "unfit" or that the parent's appointment as conservator would significantly impair the child's physical health or emotional well-being. *See In re A.V.*, No. 05-20-00966-CV, 2022 WL 2763355, at *4–5 (Tex. App.— Dallas July 15, 2022, no pet.) (mem. op.); *In re N.H.*, 652 S.W.3d 488, 495–98 (Tex. App.— Houston [14th Dist.] 2022, pet. filed). We thus agree with Rosita that—if the trial court applied the fit-parent presumption—its application thereof was an abuse of discretion because the trial court has no discretion in determining what the law is or in applying the law to the facts, *see Walker*, 827 S.W.2d at 840, and the trial court's failure to apply the proper standard of law or of proof is an abuse of discretion, *Upjohn Co. v. Freeman*, 847 S.W.2d 589, 590–91 (Tex. App.— Dallas 1992, no writ).

Appellate courts presume that a trial court, sitting without a jury, applied the correct standard of proof or of law absent a showing to the contrary, and it is the appellant's burden to show that the proper standard was not applied. *In re D.E.W.*, 654 S.W.2d 33, 36 (Tex. App.—Fort Worth 1983, writ ref'd n.r.e.); *see also In re E.E.V.*, No. 04-13-00402-CV, 2013 WL 4829171, at *2 (Tex. App.—San Antonio Sept. 11, 2013, pet. denied) (mem. op.) (overruling appellant's issue in which she argued that trial court failed to apply correct bill-of-review elements because nothing in record supported argument); *Vickery v. Commission for*

16

*Law. Discipline*, 5 S.W.3d 241, 251 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) ("Where the record is ambiguous or silent, the presumption of validity will supply by implication every . . . proper application of the law needed to support the judgment."); *Ex parte Jackson*, 911 S.W.2d 230, 234 (Tex. App.—Houston [14th Dist.] 1995, orig. proceeding) (applying presumption that trial court applied correct standard of proof in absence of relator's making any showing that trial court applied incorrect standard). We next consider whether the record supports Rosita's assertion that the trial court applied the fit-parent presumption.

Considering the above-cited statements that the trial court made at the evidentiary hearing as well as at the two later hearings, in conjunction with its reluctance to allow Rosita to proffer more evidence as to how G.K. was doing in Rosita's care, we conclude that the trial court did, in fact, apply the fit-parent presumption and that such application, as explained above, was improper. Therefore, the trial court abused its discretion. *See Upjohn*, 847 S.W.2d at 590–91 (after reviewing statements that trial court made on record at hearing, holding that trial court abused discretion in applying clear-and-convincing-evidence standard of proof to relator's request for discovery-sealing order instead of correct preponderance-of-evidence standard) (citing *NCNB Tex. Nat'l Bank v. Coker*, 765 S.W.2d 398, 400 (Tex. 1989) (orig. proceeding)) *see also In re M.A.S.*, No. 04-06-00629-CV, 2007 WL 2608552, at *2 (Tex. App.—San Antonio Sept. 12, 2007, no pet.) (mem. op.) (holding that trial court abused its discretion in applying fit-parent presumption in modification proceeding and remanding to trial court for further proceedings), *disapproved of on other grounds by C.J.C.*, 603 S.W.3d at 819 n.79.

Having determined that the trial court abused its discretion by erroneously applying the law as to the fit-parent presumption, we must consider whether such error was harmful. *See* Tex. R. App. P. 44.1. Error is harmful and thus reversible if the error probably

caused the rendition of an improper judgment (the "improper-judgment prong") or if the error probably prevented the appellant from properly presenting the case to the court of appeals (the "prevented-from-presenting prong"). *See In re Commitment of Jones*, 602 S.W.3d 908, 913–14 (Tex. 2020) (citing Tex. R. App. P. 44.1). The prevented-from-presenting prong "generally applies when something prevents an appellate court from evaluating harm." *Id.* at 914. Under it, the proper inquiry is "whether the appellate court can review the record to determine whether the trial court's error probably caused the rendition of an improper judgment." *Id.* If the error prevents the appellate court from doing so, the error is harmful. *See id.*

Having reviewed the entire record, we cannot confidently determine whether the trial court's error in applying the law probably caused the rendition of an improper judgment because—even though the trial court, as factfinder, was the sole judge of the witnesses' credibility, the weight to be given their testimony, and the inferences to be drawn therefrom, *see City of Keller v. Wilson*, 168 S.W.3d 802, 819–21 (Tex. 2005)—the trial court's viewing of the evidence through the fit-parent lens necessarily informed its factfinding functions. In other words, a factfinder's evaluations of the evidence are necessarily affected by the burden and standard of proof the factfinder employs when considering the evidence. We therefore cannot know what relevant evidence the trial court simply refused to admit or disregarded because it was looking solely for any evidence indicating that Kimbrough might be "unfit."[6] We simply

---

[6] Besides the well-known, non-exhaustive *Holley v. Adams* factors, *see* 544 S.W.2d 367 (Tex. 1976), other factors relevant in modification proceedings include the child's need for stability and the need to prevent constant litigation in child-custody cases. *In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000). The significance of these additional factors in modification proceedings is reflected in the legislature's imposition of a higher burden of proof than best interests on a person seeking to change the designation of the person having the exclusive right to designate a child's primary residence within a year of the order making such designation, as Kimbrough sought to do here. *See* Tex. Fam. Code § 156.102.

cannot discern on this record whether the trial court would have made the same ultimate fact findings had it allowed certain evidence and weighed the evidence under the appropriate, and higher, standard of G.K.'s best interest rather than considering merely the threshold question of whether Kimbrough is a "fit parent."

Furthermore, the trial court's error in applying the law affected its gatekeeping function, both before and after Rosita brought the error to its attention in her motions for reconsideration and for new trial. Although Rosita sought to introduce more evidence, the trial court "took it as a given" that Rosita's evidence would show that G.K. is thriving in her present home and circumstances—effectively concluding that any such evidence was irrelevant. Finally, the trial court's comments at the beginning of trial, which set forth its improper legal conclusion that Rosita had a "pretty high" burden to prove some "pretty significant reason" for why Kimbrough should not be G.K.'s managing conservator, probably affected the evidence that both parties decided to elicit and omit at trial.

We conclude that the nature and effects of the trial court's error in applying the law prevents this Court from determining whether the error probably caused the rendition of an improper judgment and that the error is, accordingly, harmful. *See* Tex. R. App. P. 44.1(a)(2); *Jones*, 602 S.W.3d at 913–14. We reverse the trial court's order and remand the cause to the trial court for further proceedings consistent with this opinion. *See M.A.S.*, 2007 WL 2608552, at *2 (reversing and remanding for further proceedings due to trial court's error in misapplying parental presumption); *Upjohn*, 847 S.W.2d at 592 (reversing and remanding for new Rule 76a hearing upon finding that trial court abused discretion in improperly applying clear-and-convincing-evidence standard of proof instead of preponderance-of-the-evidence standard).

19

## CONCLUSION

Having sustained Rosita's sole issue, we reverse the trial court's order and remand this case for further proceedings consistent with this opinion.

_____

Thomas J. Baker, Justice

Before Justices Baker, Kelly, and Theofanis

Reversed and Remanded

Filed:   September 20, 2023